IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLMER DIMITRI ESCALONA-REID [1] AND RICHARD BERNAND [3],<br><br>Defendants. | CRIM. NO. 20-203 (SCC) |

**OPINION AND ORDER**

Mr. Escalona and Mr. Bernand have moved to dismiss the Indictment on the ground that the government lacks jurisdiction under the Maritime Drug Law Enforcement Act (MDLEA) to prosecute them. Docket No. 112.[1] The U.S. Coast Guard encountered the defendants' vessel about 58 nautical miles southwest of Isla Saona, Dominican Republic.[2] Docket No. 1-1, pg. 2. The vessel displayed no indicia of nationality. *Id.* From the water nearby, the Coast Guard recovered three

---

1. We allowed Mr. Bernand to join Mr. Escalona's motion to dismiss. Docket No. 114. The motion contains one additional ground for dismissal: the government's failure to prosecute. We reject that ground in the line order associated with this opinion and order.

2. The defendants accept the allegations in the complaint affidavit for purposes of their motion to dismiss. *See* Docket No. 112, pg. 1 n.1.

packages, weighing approximately 150 kilograms. *Id.* at 2–3. The vessel's master claimed Colombian nationality for the vessel and the three people onboard. *Id.* Colombia could neither confirm nor deny its registry or nationality. Docket No. 117-2, pg. 1 (U.S. State Department Certification). So the Coast Guard deemed the vessel without nationality under 46 U.S.C. § 70502(d)(1)(C) and enforced U.S. law. Docket No. 1-1, pg. 3. The crew and the vessel tested negative for controlled substances. *Id.* But the packages tested positive for cocaine. *Id.* The government charged the vessel's occupants with conspiring to possess with intent to distribute a controlled substance aboard a vessel subject to U.S. jurisdiction and the substantive offense. Docket No. 10.

The First Circuit then published *United States v. Dávila-Reyes*, 23 F.4th 153 (1st Cir. 2022). *Dávila-Reyes* held that Congress's authority to define and punish felonies committed on the high seas is constrained by international law. *Id.* at 183. The panel determined that under international law, at least where there are no circumstances giving reason to doubt the vessel's claim, a vessel that makes an oral claim of nationality

is considered a vessel *with* nationality. *Id.* at 194–95. But the MDLEA considers a vessel whose master makes an oral claim of registry, which the claimed flag state does not confirm, a vessel *without* nationality. § 70502(d)(1)(C). Since registry and nationality mean the same thing, 23 F.4th at 169, § 70502(d)(1)(C) was inconsistent with international law. Thus, the panel held, Congress exceeded its authority under the Define and Punish Clause in enacting § 70502(d)(1)(C). *Id.* at 195. But *Dávila-Reyes* is no longer good law. The First Circuit withdrew it when it granted rehearing en banc. *United States v. Reyes-Valdivia*, 38 F.4th 288, 288 (1st Cir. 2022). The en banc opinion has not yet been issued. So although we write in the shadow of *Dávila-Reyes*, it has no weight here.

### I.

The defendants argue that Congress's authority under the Define and Punish Clause is constrained by international law. Under international law, they say, an oral claim of nationality constitutes a rebuttable *prima facie* showing of nationality. Because § 70502(d)(1)(C) is inconsistent with that understanding, their argument goes, Congress exceeded its

authority in enacting that section and the government lacks jurisdiction to prosecute them under it. Docket No. 112, pgs. 7–11. Jurisdiction, in this context, refers to the MDLEA's substantive reach, not our subject-matter jurisdiction. *United States v. González*, 311 F.3d 440, 443 (1st Cir. 2002). The government bears the burden of proving by a preponderance of the evidence that the defendants' vessel falls within the MDLEA's reach.[3] *United States v. Matos-Luchi*, 627 F.3d 1, 5 (1st Cir. 2010). We begin with whether the defendants' vessel falls within the MDLEA's reach, then we turn to whether there are constitutional problems with its reach.

The MDLEA prohibits certain conduct aboard vessels without nationality. § 70503(a) (describing acts prohibited aboard covered vessels); § 70502(c)(1)(A) (including a vessel without nationality as a covered vessel). There are three types of "vessel without nationality": those where the master (A) makes a claim of registry that the claimed flag state denies,

---

3. At some point we need to determine whether there is U.S. jurisdiction over the defendants' vessel, in accordance with 46 U.S.C. § 70504(a). Because the defendants' motion seeks to dismiss the Indictment on jurisdictional grounds, we will make that determination now.

(B) fails to make a claim of nationality or registry upon request, and (C) makes a claim of registry that the claimed flag state does not confirm. §§ 70502(d)(1)(A)–(C). But this list is not exhaustive. *Matos-Luchi*, 627 F.3d at 4. "At the very least," vessels without nationality include those "that could be considered stateless under customary international law." *Id.* For shorthand, we will call this § 70502(d)'s residual category.

A careful reader may have noticed a semantic wrinkle. Although, formally speaking, registry and nationality are different, the First Circuit has interpreted §§ 70502(d)(1)(A) and (C) as covering claims of nationality. To be sure, as written, those subsections apply only where a vessel's master makes a claim of registry. But the First Circuit has said that they also apply to a vessel "for which a claim of nationality is made but rejected or not backed up by the nation invoked." *Matos-Luchi*, 627 F.3d at 6. And it makes sense to treat registry and nationality as synonyms. Under international law's flag-state system, each nation determines "the conditions on which it will grant its nationality to a [vessel], thereby

accepting responsibility for it and acquiring authority over it." *Lauritzen v. Larsen*, 345 U.S. 571, 584 (1953). Registry is how the nation keeps track of the vessels to which it has granted its nationality. *See* HERMAN MEYERS, THE NATIONALITY OF SHIPS 129–30 (1967). But not all nations register small vessels. *United States v. Trinidad*, 839 F.3d 112, 123 (1st Cir. 2016) (Torruella, J., dissenting). So, as a technical matter, nationality is broader than registry. As a practical matter, however, nationality and registry occur in tandem on the high seas. International law sources often use those terms interchangeably. MEYERS, *supra*, at 28; *see also* N.P. READY, SHIP REGISTRATION 3 (3d ed. 1998). It looks like the MDLEA does, too. For example, a vessel can claim "nationality or registry" by "flying its nation's ensign or flag" or producing "documents that evidenc[e] the vessel's nationality." § 70502(e). Neither of those necessarily have anything to do with whether the vessel is registered with a flag state. Because a claim of both nationality and registry can be made by things that reflect only a vessel's nationality, it appears that Congress also uses those words interchangeably.

Because the MDLEA uses registry and nationality interchangeably, the government has proven by a preponderance of the evidence that it has jurisdiction over the vessel under § 70502(d)(1)(C). That section applies when a vessel's master makes a claim of nationality or registry that the claimed flag state does not confirm. That is what happened here. The master claimed Colombian nationality, and the U.S. State Department Certification conclusively proves that Colombia could not confirm that claim. § 70502(d)(2).

Even if § 70502(d)(1)(C) does not use registry and nationality interchangeably, there is still jurisdiction under § 70502(d)'s residual category. Under international law, an interdicting state may exercise jurisdiction over a vessel that bears no visual indicia of nationality and makes an unsubstantiated oral claim of nationality. For a vessel that fails to carry evidence of its nationality flouts the flag-state system and is therefore subject to any state's jurisdiction.

Returning to the flag-state system, every vessel must sail under the flag of one state. *United States v. Aybar-Ulloa*, 987

F.3d 1, 5 (1st Cir. 2021) (en banc). Every state sets the conditions for granting its nationality and registering its vessels, provides documents to each vessel entitled to fly its flag, and "ensure[s] 'that every vessel may be identified from a distance.'" *Id.* (first quoting U.N. Convention on the Law of the Sea arts. 91(1)–(2), Dec. 10, 1982, 1833 U.N.T.S. 397; and then quoting 1 L.F.L. OPPENHEIM, INTERNATIONAL LAW §§ 290 (Jennings et al. eds., 9th ed. 2008)). This system serves several purposes. A state generally may not interfere with a vessel lawfully flying under another's flag, thus ensuring freedom of navigation on the high seas. *Id.* (quoting Richard A. Barnes, *"Flag States," in* THE OXFORD HANDBOOK ON THE LAW OF THE SEA 314 (Rothwell et al. eds. 2015)). Flying a flag also displays to the world the nation responsible for the vessel's conduct. *Id.* (quoting R.R. CHURCHILL & A.V. LOWE, THE LAW OF THE SEA 205 (1988)); *see also Lauritzen*, 345 U.S. at 584 ("Each state . . . determine[s] for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it."). A vessel that flouts this system by sailing under no flag "is

susceptible to the jurisdiction of any [s]tate." *Aybar-Ulloa*, 987 F.3d at 6 (quoting Barnes, *supra*, at 314).

Under international law, "[n]ationality is evidenced to the world by the [vessel]'s papers and its flag." *Lauritzen*, 345 U.S. at 584; *see also Matos-Luchi*, 627 F.3d at 5 ("By custom, a vessel claims nationality by flying the flag of the nation with which it is affiliated or carrying papers showing it to be registered with that nation."). The vessel's master may also make an oral claim of nationality. *Matos-Luchi*, 627 F.3d at 5; *cf.* Ready, *supra*, at 3 ("A vessel may be considered as possessing the nationality of a [s]tate even though she is unregistered, possesses no documents evidencing that nationality, nor even flies the flag of the state."). But merely having a nationality "is not enough"—the vessel "must claim it and be in a position to provide evidence of it." *Matos-Luchi*, 627 F.3d at 6 (quoting Andrew W. Anderson, *Jurisdiction Over Stateless Vessels on the High Seas: An Appraisal Under Domestic and International Law*, 13 J. Mar. L. & Com. 323, 341 (1982)). In *Matos-Luchi*, the First Circuit explained that the MDLEA "follows this approach" because it includes as vessels without

nationality those "for which a claim of nationality is made but rejected or not backed up by the nation invoked." 627 F.3d at 6. At bottom, the concept of statelessness under international law and the MDLEA is prudential. *Id.* Regardless of the connections a vessel has with a state, the "controlling question is whether at the point at which the authorities confront the vessel, it bears the insignia or papers of a national vessel or its master is prepared to make an affirmative and sustainable claim of nationality." *Id.*

Multilateral treaties about drug trafficking on the high seas are consistent with *Matos-Luchi*'s understanding of international law. Under the U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, an interdicting state needs to seek permission from the claimed flag state before taking action against a vessel that flies that state's flag or bears its "marks of registry." U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances art. 17(3), Dec. 20, 1988, 1582 U.N.T.S. 95. In contrast, there is no requirement for an interdicting state to seek permission to suppress drug trafficking on a vessel

flying the interdicting state's flag or "displaying [no] flag or marks of registry." *Id.* at art. 17(2). So 191 nations, including Colombia, implicitly agree that a master's unsubstantiated oral claim of nationality does not trigger an obligation that the interdicting state seek permission from the claimed flag state before taking action against the vessel.[4] *See U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances*, U.N. TREATY COLLECTION, https://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=VI-19&chapter=6&clang=_en (last visited Dec. 7, 2022) (noting that 191 nations are parties to this agreement). A multilateral treaty among Caribbean nations says this explicitly. If, on the high seas, a state interdicts a vessel "claiming the nationality of another [state]," the interdicting state may deem the vessel stateless "in accordance with

---

4. Because the MDLEA requires the United States to reach out to the claimed flag state before taking action when the vessel's master makes an oral claim of nationality, the MDLEA, in this respect, appears to go beyond what international law requires. Again, under international law, there is an obligation to reach out to the claimed flag state before taking action only when the vessel supports its oral claim of nationality with evidence.

international law" when "no evidence of nationality is found" onboard the vessel. Agreement Concerning Co-Operation in Suppressing Illicit Maritime and Air Trafficking in Narcotic Drugs and Psychotropic Substances in the Caribbean Area art. 16(7), Apr. 10, 2003, https://2009-2017.state.gov/s/l/2005/87198.htm.

To take advantage of the benefits and protections of the flag-state system, a vessel must have evidence of its nationality. If it does not, it is properly deemed stateless. And that makes sense. There would be total chaos on the high seas if a vessel engaged in drug trafficking could fly no flag and carry no documents, claim a random state's nationality, and continue on its way when the claimed state could not confirm or deny its claim (which would not be surprising considering that the state would have almost no information to work with). The flag-state system does not work unless there is a nation willing and able to step forward and take responsibility for the vessel's conduct. When the vessel frustrates the claimed flag state's ability to take responsibility for it by failing to carry evidence of nationality, it has flouted

the flag-state system and is therefore properly deemed stateless. *See Matos-Luchi*, 627 F.3d at 7 ("If no registration number is visible and no other indicator [of nationality] can be discerned, the cognoscibility [of its nationality] is already demonstrably insufficient, and interference will then often be justifiable . . . ." (quoting MEYERS, *supra*, at 322)).

The defendants push back. They claim that, under international law, a naked oral claim of nationality is *prima facie* proof of nationality. Docket No. 112, pg. 8. None of the cases they rely on support their position. The first two concern the legal consequences of flying a flag. *See United States v. Bustos-Guzman*, 685 F.2d 1278, 1280 (11th Cir. 1982) (per curiam) ("The flag under which a ship sails is prima facie proof of her nationality."); *The Chiquita*, 19 F.2d 417, 418 (5th Cir. 1927) (same). There are several sources that say that flying a flag is "such strong evidence of nationality that it can be said to create a presumptive or *prima facie* nationality." Anderson, *supra*, at 338 (collecting sources). And, to be sure, the MDLEA treats an oral claim and flying a flag as equivalent ways to claim nationality. §§ 70502(e)(2)–(3). But we are aware of no

international law source, and the defendants have cited none, that says that an unsubstantiated oral claim of nationality also constitutes *prima facie* proof of nationality. The third case, *Aybar-Ulloa*, which they say held that an oral claim of nationality "establish[es] a presumption of nationality," Docket No. 112, pg. 8, did no such thing. The page that the defendants cite simply says that a master may make an oral claim of nationality for a vessel. *See Aybar-Ulloa*, 987 F.3d at 5.

To sum up, the master of the defendants' vessel made a naked oral claim of Colombian nationality. There was no evidence of Colombian nationality onboard. Colombia, unsurprisingly, considering how little information it had to go on, could not confirm that claim. Under the MDLEA and international law, the defendants' vessel is stateless and thus subject to U.S. jurisdiction.

We reached this outcome without relying on *United States v. Bravo*, 489 F.3d 1 (1st Cir. 2007), but *Bravo* binds us to it. In *Bravo*, a vessel's master claimed that it was registered in Colombia. *Id.* at 4. Colombia could neither confirm nor deny the claim. *Id.* The First Circuit held that there was jurisdiction

over the vessel under 46 U.S.C. app. § 1903(c)(2)(C), *id.* at 7— § 70502(d)(1)(C)'s old statutory location before Congress reorganized Chapter 46, *see* Act of Oct. 6, 2006, Pub. L. No. 109-304, 120 Stat. 1485. And it rejected the argument that the U.S. Coast Guard violated international law by apprehending the vessel and its crew. *Bravo*, 489 F.3d at 7. It held that the "MDLEA is in compliance with international law" because asserting jurisdiction over the vessel was "consistent with the 'protective principle.'" *Id.* (citing *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999)). The "'protective principle' of international law" allows a nation "to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security." *Cardales*, 168 F.3d at 553 (quoting *United States v. Robinson*, 843 F.2d 1, 3 (1st Cir. 1988) (Breyer, J.)). In the MDLEA, Congress found that drug trafficking aboard vessels "presents a specific threat to the security and societal well-being of the United States." § 70501. And *Bravo* held that applying the MDLEA in § 70502(d)(1)(C) cases is consistent with international law under the protective principle. 489 F.3d at 7–8.

Although *Aybar-Ulloa*[5] noted that *Cardales* "can be read as applying only to the circumstance where a foreign flag nation consents to the application of United States law to persons found on that nation's flagged vessel," 987 F.3d at 2, the First Circuit had already expanded *Cardales* beyond those facts in *Bravo*. Again, *Bravo* rejected the appellants' argument that the U.S. Coast Guard violated international law by apprehending the vessel and its crew, reasoning that the United States' exercise of extraterritorial jurisdiction there was consistent with international law's protective principle, even though the vessel made an oral claim of nationality that the claimed state did not confirm. Thus, *Bravo*'s reliance on the protective principle, in a § 70502(d)(1)(C) fact pattern, is a holding that binds us here.

Now to the defendants' argument that Congress exceeded its authority under the Define and Punish Clause when it enacted § 70502(d)(1)(C) because that section is

---

5. *Aybar-Ulloa* did not undermine the First Circuit's protective principle jurisprudence. It declined to rely on those cases because it did not have to. 987 F.3d at 3 ("We also need not and do not rely on the protective principle, leaving its potential application for another day.").

inconsistent with international law, which they contend implicitly limits Congress's power under that clause. The government misconstrues their argument. It dedicates most of the legal analysis in its three-page response to explaining why the defendants lack standing to raise the United States' noncompliance with international law as a defense. *See generally* § 70505 (stating defendants prosecuted under the MDLEA "do[ ] not have standing to raise a claim of failure to comply with international law as a basis for a defense. A claim of failure to comply with international law in the enforcement of this chapter may be made only by a foreign nation."). But that is not the defendants' argument. Their argument is that Congress lacked the authority to enact § 70502(d)(1)(C). That is a domestic law objection, not an international law one. So we have no briefing from the government about whether Congress's authority under the Define and Punish Clause is constrained by international law. But that does not matter.

The defendants' argument that Congress's authority under the Define and Punish Clause is constrained by international law is based on their misunderstanding that the

First Circuit and U.S. Supreme Court have already held that it is. First, Chief Judge Barron's concurrence in *Aybar-Ulloa* does not say that Congress's power under the Define and Punish Clause is constrained by international law. He merely points out that "[t]here is a fair amount of support" for that position. *Aybar-Ulloa*, 987 F.3d at 15 (Barron, C.J., concurring). Second, the Supreme Court, as far as we are aware, has not held that Congress's authority under the Define and Punish Clause is constrained by international law. The defendants claim otherwise, citing with no explanation a slew of cases from the early 1800s. Docket No. 112, pg. 7 (citing *United States v. Furlong*, 18 U.S. (5 Wheat.) 184 (1820); *United States v. Holmes*, 18 U.S. (5 Wheat.) 412 (1820); *United States v. Klintock*, 18 U.S. (5 Wheat.) 144 (1820); *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818)). But we see nothing in any of those cases that resembles a holding that Congress's authority under the Define and Punish Clause is constrained by international law. Because the defendants' constitutional challenge is limited to their mistaken belief that binding precedent has held that Congress's authority under the Define and Punish Clause is

constrained by international law and that is not true, there is no need to reach the merits of their challenge. And, in any event, as explained, exercising jurisdiction over the defendants' vessel is consistent with international law. So it makes no difference whether international law constrains Congress's authority under the Define and Punish Clause.

Finally, the defendants perfunctorily assert that § 70502(d)(1)(C) violates the Due Process Clause because it is "unconstitutionally vague, subject to arbitrary enforcement, and criminalizes conduct and persons that have no ties to the United States." Docket No. 112, pg. 10. This one-sentence assertion is wholly unsupported and undeveloped, so we disregard it. *See United States v. Hernández-Román*, 981 F.3d 138, 146–47 (1st Cir. 2020) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990))).

## II.

In sum, the Court **DENIES** the defendants' motion to dismiss (Docket No. 112) and **FINDS** that the government has

proved by a preponderance of the evidence that there is U.S. jurisdiction over the defendants' vessel under § 70502(d)(1)(C) and § 70502(d)'s residual category.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 8th day of December 2022.

S/ SILVIA CARREÑO-COLL
UNITED STATES DISTRICT COURT JUDGE